**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | **No. 25CR160** |
| **v.** | ) | |
| | ) | |
| | ) | **Hon. Sharon Johnson Colmen** |
| **TIMOTHY MCDOWELL** | ) | |
| | ) | |

# DEFENDANT TIMOTHY McDOWELL'S SENTENCING MEMORANDUM

Timothy McDowell is before this Court for a sentencing after pleading guilty to being a felon in possession of a firearm. He accepts responsibility for his actions and is prepared to serve a just sentence. He understands that his offense was a serious one and knows that there will be punishment for his crime, but he asks the Court to balance the need to account for the seriousness of the offense with the substantial mitigation present in his case. Because the United States Sentencing Guidelines provide for a sentence greater than necessary to fulfill the statutory sentencing objectives, Mr. McDowell, by the Federal Defender Program and its attorney, Kathleen Leon, requests that the Court impose a sentence below the advisory sentencing guidelines range. Specifically, Mr. McDowell asks that this Court impose a sentence of **60 months followed by the maximum term of supervised release.**

## Background

On July 30, 2024, Mr. McDowell was one of four occupants in a stolen vehicle traveling on Chicago's John F. Kennedy Expressway. Mr. McDowell was seated in the back passenger seat. After the vehicle exited the expressway, it pulled into a detached garage in a residential neighborhood. All four occupants exited the vehicle and fled on foot. Mr. McDowell was observed carrying a backpack, which he attempted to discard before he was apprehended. The backpack contained five loaded firearms, including one firearm with an obliterated serial number and several firearms that had previously been reported stolen. Mr. McDowell accepted responsibility for possessing the firearms contained in the backpack and entered a timely guilty plea.

The facts beyond those admitted by Mr. McDowell, however, are far less certain. Although the circumstances of the offense may invite assumptions, the government bears the burden of proving aggravating facts at sentencing by a preponderance of the evidence. Here, the government has not provided any evidence of when Mr. McDowell entered the vehicle, how long he had been in the vehicle, who owned or possessed the individual firearms before July 30, 2024, or who placed the firearms in the backpack. Likewise, the government has not set forth any evidence of how Mr. McDowell came to possess the backpack or that it was his backpack. There is no evidence establishing that Mr. McDowell knew the vehicle was stolen, altered or caused the alteration of any firearm's serial number, knew that any serial number had been altered, stolen or knew any of the firearms were stolen.

These distinctions matter. Mr. McDowell does not seek to minimize his conduct or retreat from the responsibility he accepted by pleading guilty - he clearly had the

backpack after leaving the garage that the vehicle was parked in. Rather, he asks the Court to sentence him based on the conduct the government has proven - not on speculation or assumptions about conduct the evidence does not establish. Section 3553(a) requires an individualized assessment of Mr. McDowell's actual conduct and culpability, and a sentence that reflects those proven facts rather than unproven inferences.

Mr. McDowell has pled to the charge in the indictment. The PSR contemplated an offense level of 23 and eleven criminal history points, yielding a Criminal History Category of V. Mr. McDowell specifically reserved his right to challenge the calculation of eleven criminal history points as well as his offense level.

**Discussion**

As this Court is aware, after *Booker* the United States Sentencing Guidelines are merely "advisory," and sentencing courts are required to consider all the factors listed in 18 U.S.C. § 3553(a) in imposing sentence. *United States v. Booker*, 543 U.S. 220, 245 (2005). After considering these factors, the Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with" the purposes of sentencing. 18 U.S.C. § 3553(a) (emphasis added). This parsimony provision serves as the "overarching" command of the statute. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

**I. The Strict Liability Application of the 2k2.1(b)(4)(B)(i) Enhancement for Possession of Stolen Firearms and defaced serial number Serves No Deterrent Purpose and Overstates the Severity of Mr. McDowell's Offense.**

The Government further argues that the stolen firearms is not reflected in Mr.

McDowell's advisory guideline range. The Guidelines themselves demonstrate otherwise. Section 2K2.1(b)(4) expressly accounts for stolen firearms through a two-level enhancement, while separately providing a four-level enhancement for firearms with qualifying serial-number modifications. Rather than permitting both enhancements to apply cumulatively, the Sentencing Commission deliberately chose to apply only the greater enhancement in these circumstances. That policy judgment reflects the Commission's determination that these firearm characteristics should not be stacked to increase a defendant's advisory range. The Government's request that the Court nevertheless treat the stolen nature of the firearms as an additional aggravating circumstance effectively asks the Court to impose the very cumulative punishment the Guidelines decline to impose.

While Mr. McDowell recognizes that the four-level enhancement under § 2K2.1(b)(4)(B) may technically apply under the advisory Guidelines, the Court is not required to treat that enhancement as reflecting his actual culpability. The enhancement applies regardless of whether the defendant knew the firearm bore a defaced serial number, whether he altered the serial number himself, or whether he had any involvement whatsoever in the firearm's condition. In Mr. McDowell's case, there is no evidence that he altered the serial number, knew a serial number had been altered, or even selected or acquired the firearm at issue. The enhancement therefore increases his advisory guideline range based solely upon a characteristic of the firearm entirely unrelated to his own conduct or mental state.

The Sentencing Commission itself recently recognized that the prior version of § 2K2.1(b)(4)(B) swept too broadly. Effective November 1, 2025, the Commission

amended the enhancement to require that the serial number be modified such that the original information is rendered illegible or unrecognizable to the unaided eye. By narrowing the enhancement, the Commission acknowledged that not every imperfection or alteration to a serial number justifies identical punishment. Although that amendment may not technically govern Mr. McDowell's sentencing, it is persuasive evidence that the prior guideline often overstated offense seriousness.

That concern is particularly acute here. Nothing suggests Mr. McDowell altered the serial number, directed anyone else to do so, or even knew of its condition. Yet the Guidelines assign the same four-level increase to a defendant who personally grinds a serial number completely off a firearm to conceal its origin as they do to a defendant who unknowingly possesses a firearm whose serial number was previously altered by someone else. The advisory Guidelines make no distinction between those markedly different levels of culpability.

The government argues that the Guidelines already account for the firearm's characteristics because one firearm had a defaced serial number. That is true only in the technical sense that the enhancement increases the advisory range. It does not answer the separate question required by § 3553(a): whether the resulting advisory range accurately reflects this defendant's personal blameworthiness. Here, it does not. The enhancement punishes Mr. McDowell for a condition of the firearm created by another person and without any showing that he possessed the knowledge, intent, or purpose that ordinarily justifies greater punishment.

Consistent with *Kimbrough v. United States*, 552 U.S. 85 (2007), the Court may conclude that the advisory guideline gives undue weight to this strict-liability

enhancement when fashioning a sentence sufficient, but not greater than necessary. Because there is no evidence that Mr. McDowell knew of, participated in, or benefitted from the defaced serial number, the resulting offense level overstates the seriousness of his individual conduct. The Court should therefore afford the enhancement reduced weight when evaluating the advisory guideline range under § 3553(a).

## II. Mr. McDowell's Youth Provides Context for his Offense, 18 U.S.C. §3553(a)(1), 18 U.S.C. §3553(a)(2)(B).

Timothy McDowell did not begin life with the safety, stability, or guidance that most children take for granted. His earliest memories are not of security or unconditional love, but of abandonment, violence, and survival. Before he was old enough to understand the world around him, the adults responsible for protecting him had already failed him in nearly every imaginable way.

When Mr. McDowell was just five years old, his family was torn apart after the Department of Children and Family Services removed the children from the home. In an instant, he was separated not only from his parents but from most of his siblings. Three of his sisters were ultimately adopted into another family against his mother's wishes. For nearly a decade, they disappeared from his life entirely. His brother James, the child whose accident precipitated the investigation, was gone as well. What remained of Mr. McDowell's family was fractured beyond recognition.

The foster home that was supposed to provide refuge instead became another source of profound trauma. From the ages of approximately five until eight, Mr. McDowell and his younger sister endured repeated physical and sexual abuse at the

hands of an older foster sibling. They were tied to beds. They were humiliated. They were sexually exploited. They were children who had no ability to escape and no adults willing to protect them. When Mr. McDowell found the courage to report the abuse to his DCFS case worker, nothing happened. No investigation followed. No one intervened. A vulnerable child did exactly what society asks abused children to do—he told someone—and the system charged with protecting him failed to act.

The abuse did not end when he returned home. Instead, Mr. McDowell entered another environment marked by addiction, neglect, and violence. His mother, struggling with cocaine, heroin, and alcohol addiction, and his stepfather, himself addicted to drugs and alcohol, were unable to provide even the most basic stability. The adults in his life routinely left him and his siblings alone in parks, at strangers' homes, and even asking strangers for money. Mr. McDowell's aunt recounted a time she saw young Timothy standing at a gas station in February offering to pump gas for individuals in exchange for their loose change - she later learned the money would go to his mother who put him up to the task so she could buy drugs. His stepfather physically abused him, particularly while intoxicated. Home was not a place of comfort; it was simply another place where survival required constant vigilance.

As his home life deteriorated, so too did his ability to experience a normal childhood. The instability and violence that surrounded him inevitably spilled into his education and, eventually, his substance abuse. Like so many aspects of Mr. McDowell's life, his education was shaped by instability rather than opportunity. He attended Hyde Park Academy until the eleventh grade, when he was expelled following a physical altercation with rival peers. He later enrolled in Richard Milburn

High School, an alternative school, but the daily commute required traveling through neighborhoods plagued by violence. Concerned for his safety after witnessing increasing violence directed toward passengers on his bus route, Mr. McDowell stopped attending school. By that point, education had become secondary to simply navigating the dangers of daily life.

Mr. McDowell's substance abuse history similarly cannot be divorced from the circumstances of his childhood. He began smoking marijuana at just ten years old and drinking alcohol at eleven by consuming bottles his mother left unattended. In a home where addiction was pervasive and adult supervision was virtually nonexistent; drugs and alcohol became normalized long before he could appreciate their consequences. As he grew older, his substance use escalated to include PCP, ecstasy, and psilocybin, while marijuana became a daily dependence and alcohol consumption reached dangerous levels. Rather than serving as recreation, these substances became a means of coping with years of untreated trauma, abuse, and loss.

Eventually, even that instability became too much. At just thirteen years old, Mr. McDowell made the heartbreaking decision to leave home and live on the streets. Few children choose homelessness because they believe it offers a better life. They choose it because home has become unbearable. Alone and frightened, he joined the Gangster Disciples – not out of ambition or prestige – but because, in his words, he believed it was necessary for protection. In neighborhoods where violence often determines survival, children do not always choose gangs; sometimes they believe gangs are the only thing to choose them.

Mr. McDowell's childhood contained almost none of the protective factors that

foster healthy development. There was no consistent parent, no reliable adult advocate, no safe home, no meaningful supervision, and no stable support system. Instead, he experienced family fragmentation, severe abuse, neglect, substance abuse in the home, homelessness, and exposure to community violence before reaching adolescence. Research has repeatedly demonstrated what common experience already tells us: repeated childhood trauma fundamentally alters emotional development, decision-making, impulse control, and one's ability to trust others. Trauma does not excuse criminal conduct. It does, however, help explain how a child raised in chaos becomes an adult whose life too often reflects the circumstances into which he was born rather than the opportunities he never had.

Yet despite everything he endured, Mr. McDowell never abandoned the desire to improve himself. While incarcerated in 2014, he earned both his General Educational Development ("GED") certificate and a vocational certificate in carpentry. He has also developed marketable skills operating commercial trucks and has expressed a desire to obtain his Commercial Driver's License and pursue construction management upon his release. These accomplishments demonstrate that, when provided with structure and opportunity, Mr. McDowell has consistently sought to better himself and acquire legitimate skills that will allow him to support his family.

Importantly, Mr. McDowell has accepted responsibility for his addiction and its consequences. He recognizes that his substance use damaged his relationships and acknowledged that grief over the deaths of loved ones often triggered his drug use. He has identified healthier ways to manage those emotions, including spending more time

with his children and honoring the memories of those he has lost through family gatherings rather than substance use. While incarcerated in 2014, he participated in substance abuse treatment and has expressed a sincere desire to engage in additional treatment during his current sentence. His willingness to pursue both education and treatment reflects a man who has repeatedly demonstrated that, when afforded structure and meaningful rehabilitative opportunities, he works to improve himself rather than resign himself to the circumstances of his past.

Yet despite everything he endured, Mr. McDowell never lost his capacity to love his family. He eventually reconciled with the father who had been absent for much of his childhood and, before this case, spoke with him every day. He maintained close relationships with several of his children, communicating with many of them daily and providing financial support before his arrest. He married in 2019 and remains devoted to his wife, with whom he continues to speak every day. These relationships reveal something remarkable: despite growing up without dependable parental love, Mr. McDowell has continued to seek connection, family, and responsibility.

Even members of his extended family recognize these qualities. His aunt, Donna Davis—the relative who repeatedly opened her home to him when others would not—describes him as "very intelligent" and "loving." She attributes much of his criminal history not to a lack of ability or character, but to the absence of structure, guidance, and stability throughout his childhood. Her continued support reflects a belief shared by those who know him best: that Mr. McDowell is more than the worst decisions he has made.

None of this diminishes the seriousness of the offense before the Court. But §

3553(a) requires sentencing courts to consider not only what a defendant did, but who he is and how he came to stand before the Court. Mr. McDowell's life has been defined by adversity almost from the beginning. He entered foster care as a frightened child, endured years of horrific abuse, returned to a home ravaged by addiction and violence, became homeless as a young teenager, and sought safety wherever he could find it.

That history cannot change the past. It cannot erase his mistakes. But it provides essential context for understanding the person before the Court today. Mr. McDowell's life is not the story of someone who squandered every opportunity afforded to him. It is the story of someone who spent his childhood trying to survive circumstances that no child should ever have to endure. The sentence imposed should reflect not only accountability for his conduct, but also the extraordinary hardship that shaped the man who now stands before this Court.

### Proposed Conditions of Supervised Release

Mr. McDowell does not object to the proposed conditions of supervised release, apart from the following:

- **Special Condition #3:** This condition requests that Mr. McDowell perform at least 20 hours of community service a week if he is not employed within 60 days of release. Mr. McDowell notes that searching for and applying for jobs is often a time-consuming process, and that Special Condition #2 requires him to participate in a job skill-training program in that first 60 days as well. To the extent that the community service hours requirement interferes with Mr. McDowell's ability to look for gainful employment, this condition should not be imposed.

### Conclusion

Mr. McDowell understands that his crime was serious and that he must serve a just sentence. He asks the Court to consider the Supreme Court's logic in *Gall*, where the Court reasoned that respect for the law is promoted when harsh punishment is tempered by consideration of an offender's character and personal history, in addition to the specific characteristics of the case at hand. *See* 552 U.S. at 54.

**Wherefore**, based on the sentencing factors and arguments set forth above, Timothy McDowell respectfully requests that this Court impose a sentence of 60 months.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy, Executive Director

By: *s/ Kathleen Leon*
Kathleen Leon
Attorney for Timothy McDowell

Federal Defender Program
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8341

## CERTIFICATE OF SERVICE

The undersigned, Kathleen Leon, an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CRIM. P. 49, FED. R. CIV. P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document(s):

**DEFENDANT TIMOTHY McDOWELL'S SENTENCING MEMORANDUM**

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on August 10, 2026, to counsel/parties that are non-ECF filers.

By: *\/s/ Kathleen Leon*
KATHLEEN LEON
FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, Illinois 60603
(312) 621-8341